UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

KELLY OBRYAN on behalf of J.O.

                Plaintiff,

v.                                        No. 10-CV-1551 (DRH)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

---

**APPEARANCES:**                              **OF COUNSEL:**

PETER M. MARGOLIUS, ESQ.
Attorney for Plaintiff
7 Howard Street
Catskill, New York 12414

HON. RICHARD S. HARTUNIAN          ANDREEA L. LECHLEITNER, ESQ.
United States Attorney for the            Special Assistant U.S. Attorney
   Northern District of New York
Attorney for Defendant
100 South Clinton Street
Syracuse, New York 13261-7198

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

## MEMORANDUM-DECISION AND ORDER[1]

    Plaintiff Kelly Obryan, on behalf of her son, J.O., brought this action pursuant to 42 U.S.C. § 405(g) seeking review of a decision by the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). Obryan seeks judicial review of the Commissioner's denial of benefits. Dkt. Nos. 1, 11. The Commissioner cross-moves for a judgment on the pleadings. Dkt. No. 12. For the

---

    [1]The parties have consented to the jurisdiction of the undersigned in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. Dkt. No. 15.

reasons which follow, it is ordered that the Commissioner's decision be affirmed.

## I. Procedural History

On July 25, 2008, Obryan, on behalf of J.O., filed an application for SSI alleging an onset date of July 11, 2008. Dkt. No. 9-5 at 1-8. On December 17, 2008, the application was denied. Dkt. No. 9-4 at 2-6. On January 13, 2009, Obryan requested a hearing before an Administrative Law Judge ("ALJ"). Dkt. No. 9-4 at 11. The hearing took place before ALJ Robert Ringler on January 22, 2010. Dkt. No. 9-4 at 12-15 (acknowledgment of request for hearing); 21-25, 27-33 (notice of hearing); Dkt. No. 9-2 at 29-70 (testimony from the hearing). In a decision dated February 10, 2010, the ALJ held that J.O. was not entitled to disability benefits. Dkt. No. 9-2 at 9-25. On February 26, 2010, Obryan filed a request for review with the Appeals Council. Id. at 7-8. The Appeals Council denied Obryan's request for review on November 20, 2010, thus making the ALJ's findings the final decision of the Commissioner. Id. at 2-6. This action followed.

## II. Contentions

Obryan contends that the Commissioner was incorrect when he (1) selectively relied upon portions of the opinions of J.O.'s teachers and therapists to support his decision on the severity of J.O.'s impairment and (2) found that J.O. was not markedly impaired in the category of "caring for [him]self." The Commissioner contends that there was substantial evidence to support the determination that J.O. was not entitled to SSI.

2

### III. Facts

As both parties relied upon the ALJ's procedural determinations and the only dispute about the factual determinations is in regard to the statements by J.O.'s teachers and therapist, the undersigned will adopt the factual summaries in the ALJ's opinion regarding the other medical evidence and will discuss only those portions of the medical record identified as proving a marked disability for J.O.

### A. Teacher Evaluation

In September 2008, J.O.'s homeroom and science teacher provided an evaluation of J.O.'s behavior and ability to meet the six domains based upon his three year relationship having J.O. as his student. Dkt. No. 9-6 at 28-35. J.O.'s grade level was noted to be sixth, though his reading, math, and writing skills were all below the sixth grade level yet higher than the fifth grade level. Id. at 28. Additionally, J.O. was not receiving any special education services. Id.

The teacher noted J.O. had an obvious problem acquiring and using information because he required extra help with writing, understanding details and probing questions, and organization. Dkt. No. 9-6 at 29. J.O. had a generally slight problem with attending and completing tasks and interacting and relating with others. Id. at 30, 31, 35. J.O. could work at an appropriate pace so long as he was not frustrated or angry. Id. at 30. Additionally, J.O. could shut down when he was frustrated, though he "responds well to calm quiet intervention and positive statements." Id. at 31, 35. J.O. also had a generally slight problem with moving about and manipulating since his handwriting was not of a

grade level appearance.  Id. at 32.

    The teacher also noted that J.O. had a generally obvious problem (indicating an obvious problem persisted in six out of the ten categories on a weekly basis) with caring for himself.  Dkt. No. 9-6 at 33.  The teacher indicated that J.O.'s ability to maintain his self-control was "difficult" and that he "will strike out (kicking, cursing) toward others when angry or frustrated."  Id.  However, J.O. was also noted to have been "receiving counseling [and] ha[d] learned some strategies."  Id.  Lastly, the teacher noted that J.O. was on medication that he took at home.  Id. at 34.

    Moreover, progress reports from the Resource Room for the first quarter of the 2009/2010 school year indicated that J.O. was generally well behaved, worked independently once he understood the task, was helpful to others, and his outbursts were "occur[ring] infrequently," due to the continued use of his principle's pass.  Dkt. No. 9-7 at 112.  The pass allowed J.O. to report to a different room to calm down instead of lashing out at the situation which was frustrating and angering him.  Id. at 109, 111.  His quarterly report cards for the first half of the year also showed that his average was a high C or low B and that he appeared to be passing his courses.  Id. at 114, 116.

## B. Medical Source Statement

    Emily Krause, LCSW, from Greene County Mental Health completed a medical source statement for J.O.  Dkt. No. 9-7 at 71-75.  First, based upon family concerns and communications with school staff, Krause categorized J.O. as less than markedly restriction, finding mild restricted (in six of twelve available categories) with being able to pay attention and follow directions and moderate restrictions (in six of twelve available

4

categories) with respect to focusing and refocusing, carrying out instructions, working without distracting others, and maintaining a reasonable pace. Id. at 72. Similarly, based on observations during her sessions with J.O. and communications with the school, Kraus noted that J.O. was also less than markedly restricted in the next category finding mild restrictions (in seven of thirteen available categories) with seeking attention and acting appropriately and moderately restrictions (in four of thirteen available categories) with playing cooperatively and respecting and interpreting others. Id. at 73. The final two categories checked indicated marked restrictions with making and keeping friends and appropriately expressing his anger. Id. J.O. had no noted inabilities to manipulate objects. Id.

Additionally, based on observation and communication with the school staff, Krause noted that J.O. was mildly restricted (in three of ten available categories) in being able to care for his physical needs, personal hygiene, and use good judgment, moderately restricted (in three of ten available categories) in being able to be patient and respond appropriately to changed in his mood, and markedly restricted (in three of ten available categories) in his ability to appropriately handle frustration, identify and assert his emotional needs, and utilize coping skills. Dkt. No. 9-7 at 74. Krause also noted that he was on regularly prescribed medication. Id. at 75.

### C. ALJ's Opinion

The ALJ determined that since J.O. was born on September 8, 1997, he was a school-aged child pursuant to federal regulations. Dkt. No. 9-2 at 15. J.O. had also never engaged in substantial gainful activity. Id. J.O. suffered from two severe impairments,

attention-deficit/hyperactivity disorder ("ADHD") and an affective disorder.  Id.  However, these impairments neither alone nor together met or medically equaled a listed impairment.  Id.

The ALJ went through the various findings from the testimony elicited from J.O. and his mother during the hearing as well as the treatment notes and information provided by J.O.'s teachers.  Dkt. No. 9-2 at 16-20.  The ALJ "accorded substantial weight to the opinions of [J.O.'s] teachers since they have known him for three years, have seen him several hours a day over a lengthy span of time and are well acquainted with this functional capacities."  Id. at 19.  The ALJ also "accorded significant weight to the opinion of [J.O.'s] therapist [Emily Kraus] and finds that her opinion is not inconsistent with the opinions of the . . . teachers."  Id.

The ALJ also "accorded significant weight to the opinion of Dr. Rigberg," the consultative psychiatric examiner, who determined that J.O. was

> able to complete age-appropriate tasks when he wants to and has some trouble adequately maintaining appropriate social behavior, but seems to respond appropriately to changes in his environment. . . . He also concluded that [J.O.] asks questions and requests assistance in an age-appropriate manner as long as he takes his medication.  He seems to be aware of danger and takes needed precautions.  He can interact adequately with peers and with adults when he takes his medication.

Dkt. No. 9-2 at 19; see also Dkt. No. 9-7 at 45-54 (child psychiatric evaluation and intelligence examination with Dr. Rigberg).  The ALJ also "accorded substantial weight to the opinion of Dr. Weiss," a psychiatrist and the state agency medical consultant, who concluded that J.O.

> continues to have some impairment in concentration and behavior but based on the data f[ro]m the treating source, the teacher

6

> questionnaire and the consultant examiner the impairments are not marked. He further concluded that [J.O.] is not markedly impaired in any domain and therefore, the claimant's impairments do not meet, equal or functionally equal any listings.

Dkt. No. 9-2 at 20.

The ALJ also considered the level of J.O.'s limitations with respect to each of the functional equivalence domains. Dkt. No. 9-2 at 20-25. The ALJ concluded that J.O. had (1) no limitations in moving about and manipulating objects or his health and physical well-being; (2) a less than marked limitation in acquiring and using information, attending and completing tasks, or caring for himself; and (3) a marked limitation in interacting and relating with others. Id. Specifically, with respect to caring for himself, the ALJ concluded that J.O. was not markedly limited because he "is independent with respect to self-care. However, the claimant has problems with respect to his ability to self regulate his emotions and express feelings appropriately. Therefore, it is concluded that [J.O.] has a less than marked impairment . . . . " Id. at 24.

## IV.  Standard of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). "In addition, an ALJ must set forth the

crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).  However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.  Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If the Commissioner's finding is supported by substantial evidence, it is conclusive.  42 USC § 405(g) (2006); Halloran, 362 F.3d at 31.

"SSI offers benefits to needy disabled children under the rationale that families often have additional personal and medical expenses associated with raising a severely disabled child." Kittles ex rel. Lawton v. Barnhart, 245 F. Supp. 2d 479, 487 (E.D.N.Y. 2003) (citations omitted).  An individual under the age of eighteen (18) is disabled, and thus eligible for SSI benefits, "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 1382c(3)(C)(i).  However, "no individual under the age of 18 who engages in substantial gainful activity . . . may be considered to be disabled." Id. § (3)(C)(ii).

The statute provides a three-part analysis for determining disability.  20 C.F.R. § 416.924.

> First, the ALJ looks to see whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). If so, the child is ineligible for benefits. Next, the ALJ assesses whether the child has a severe impairment, which is defined as an impairment that causes more than a minimal functional limitation. 20 C.F.R. §

> 416.924(c). Third, if the ALJ finds a severe impairment, he then must consider whether the impairment meets or is medically or functionally equal to a disability listed in the regulatory "Listing of Impairments." 20 C.F.R. § 416.924(c); 20 C.F.R. Pt. 404, Subpt. P, App. 1 ( the "Listing").

Kittles, 245 F. Supp. 2d at 488.

> Analysis of functionality is informed by consideration of how a claimant functions in six main areas, commonly referred to as 'domains' . . . [which] include: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-being.

Leonard ex rel. A.J. v. Astrue, No. 09-CV-29 (TJM/VEB), 2011 WL 7090710, at *3 (N.D.N.Y. Nov. 3, 2011) (internal citations omitted); see also 20 C.F.R. § 416.926a(b)(1) (identifying the six domains upon which functionality is considered).  Impairments are considered to be "of listing-level severity if [the child] ha[s] 'marked' limitations in two of the domains . . . or an 'extreme' limitation in one domain." 20 C.F.R. § 416.926a(d).  An extreme limitation occurs when the "impairment(s) interfere[] very seriously with [the child's] ability to independently initiate, sustain, or complete activities." Id. § 416.926a(e)(3)(i).  Alternatively, a marked limitation occurs when the "impairment(s) interfere[] seriously with [the child's] ability to independently initiate, sustain, or complete activities." Id. § 416.926a(e)(3)(ii); see also 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00 (C) (explaining that marked "means more than moderate but less than extreme," and that where "several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained bases," the child is markedly impaired).

## V.  Discussion

The caring for yourself domain evaluates

> how well [the child] maintain[s] a healthy emotional and physical state, including how well [he or she] get[s] his or her] physical and emotional wants and needs met in appropriate ways; . . . cope[s] with stress and changes in [the] environment; and whether [her or she can] take care of [his or her] own health, possessions, and living area.

20 C.F.R. § 416.926a(k).  With respect to a child of J.O.'s age at the time disability was determined, this means

> be[ing] independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although [the child] may still need to be reminded sometimes to do these routinely. [The child] should begin to recognize that [he or she is] competent in doing some activities and . . . ha[s] difficulty with others. [The child] should be able to identify those circumstances when [he or she] feel[s] good about [him or her]self and when [he or she] feels bad. [The child] should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. [The child] should begin to demonstrate consistent control over [his or her] behavior, and [he or she] should be able to avoid behaviors that are unsafe or otherwise not good for [him or her].

Id. § 416.926a(k)(2)(iv)[2].  Moreover, the regulations provide examples of limited functioning with respect to this domain including, (1) "plac[ing] non-nutritive or inedible objects in [the] mouth"; (2) "us[ing] self-soothing activities showing a developmental regression (e.g., thumbsucking, rechewing food), or . . . restrictive or stereotyped

---

[2] The regulations also provide a definition for caring for yourself with respect to an adolescent (age 12 to age 18).  During this stage, independence should be continually increasing in day-to-day activities and also notice changes in the way the child feels about him or herself and the way he or she looks.  20 C.F.R. § 416.926a(k)(2)(v).  Additionally, during this time the child "should begin to discover appropriate ways to express [his or her] feelings, both good and bad . . . [and] begin to think seriously about . . . future plans . . . ."  Id.

10

mannerisms (e.g., body rocking, headbanging)"; (3) inability to dress or bathe appropriately; (4) "engag[ing] in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take . . . medication), or . . . ignor[ing] safety rules"; and (5) exhibiting a "disturbance in eating or sleeping patterns." Id. § 416.926a(k)(3).

Obryan first contends that the ALJ relied on only a portion of the teachers' reports and the assessment provided by Kraus because their documents, when read in their entirety, supported a finding of a marked limitation in the domain of caring for one's self. Pl. Mem. of Law (Dkt. No. 11) ¶ 10. Obryan then asserts, also related to the first claim, that the ALJ's decision that J.O. did not have a marked limitation in being able to care for himself was not supported by substantial evidence in the record. Both arguments fail.

First, the ALJ properly characterized the testimony of the teachers and therapist when determining that J.O. did not have a marked limitation. The questionnaires and medical source statements completed by both parties had multiple categories to determine the degree of J.O.'s alleged impairments. J.O.'s teacher indicated a generally obvious problem (ranking a 3 out of 5) with caring for himself because his self control was compromised and he tended to lash out. Kraus indicated a generally less than marked restriction for J.O's ability to care for himself by choosing criteria representing less than a marked impairment for over two-thirds of the eligible options. Going on to distinguish why the ALJ felt that the general majorities indicated by the teacher and therapist representing less than a marked restriction were more persuasive than the minority opinions was unnecessary. See Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983) ("Where, as here, the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he . . . have explained why he considered particular evidence

unpersuasive or insufficient to lead him to a conclusion on disability") (citations omitted); Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981) ("Notwithstanding the apparent inconsistency between [two medical] reports . . . we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony.").

Viewing the records provided by the school in conjunction with the teacher's questionnaire also provides substantial evidence to show that J.O. was not markedly impaired. J.O. was in a mainstream class, and, despite academically testing slightly lower than his grade level, was doing satisfactorily in his classes. His quarterly report from the 2009-10 school year indicated that he was generally well behaved, on task, and even helpful to some of his peers. Additionally, his outbursts were noted to have occurred infrequently in the past year due to the accommodations provided by the school. This is consistent with the teacher questionnaire, which was completed a year earlier, which indicated some disciplinary problems but also some coping strategies as a result of J.O.'s counseling. Moreover, J.O. was never noted to have any notable problems with his hygiene, taking care of his physical needs, or using judgment regarding his personal safety. This is also consistent with Kraus' report in which she found that J.O. had no limitations in cooperating or being responsible for taking his medication and only had (1) mild limitations with taking care of his personal hygiene and physical needs and attending to his safety and (2) moderate limits in calming himself, knowing when to ask for help, and being patient. While it was clear that J.O. still suffered from some limitations, the medical record supports the conclusion that they were not substantial enough to be classified as marked.

Furthermore, the ALJ also indicated various other medical sources whose conclusions

also served as substantial evidence in supporting his decision not to find a marked restriction in J.O.'s ability to care for himself. Dr. Rigberg, the consultative examiner, found that J.O. was acting age-appropriately, even more so when he took his medication. J.O.'s medication also allowed him to be aware of dangerous situations and interact adequately with his peers. Additionally, Dr. Weiss, the State agency psychiatrist who reviewed the medical evidence, also concluded that J.O. did not suffer from marked impairments or restrictions due to his age appropriate self care and activities of daily living, the significant improvement in his ability to control his behavior, remaining extremely close to grade level in his academic abilities, and the lessening or infrequent behavior issues noted by the school staff. These opinions can be entitled to substantial weight as a medical opinion. Mongeur, 722 F.3d at 1039 (explaining that a consultative physician's opinion "may constitute" evidence with such additional weight as provided to a treating physician given the fact that the opinion is consistent with the rest of the record) (citations omitted); 20 C.F.R. § 416.927(f); SSR 96-6p.

    Comparing these opinions to the facts previously discussed, it is clear that these conclusions are consistent with the overall medical record and with the findings of the ALJ. Furthermore, these opinions from acceptable medical sources, are entitled to more weight as compared to opinions from "other sources" such as an educator. See SSR 06-03P (identifying educators as an "other source" of information and explaining that this opinion "cannot establish the existence of a medically determinable impairment. Instead there must be evidence from an 'acceptable medical source' for this purpose."); but see Reid v. Astrue, No. 07-CV-577 (LEK), 2010 WL 2594611, at *5, n.4 (N.D.N.Y. June 23, 2010) ("While the opinions of educators and other non-medical sources are not entitled to

controlling weight under the regulations, they are, nevertheless, deemed valuable sources of evidence in assessing impairment severity and functioning and should be considered by the ALJ."). The ALJ properly considered these statements, indicating that they were important based upon the length of the teaching relationship and the teacher's opportunity to view J.O., but accorded them the appropriate amount of weight. Because Obryan's proffered arguments that the teacher's questionnaire should have indicated a marked impairment are less consistent with the medical record and conclusions from medical sources than the ALJ's conclusion to the contrary, the latter conclusion must be upheld, even if an alternate conclusion also could have been reached. See e.g., Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982) ("Congress has instructed us that the factual findings of the Secretary, if supported by substantial evidence, shall be conclusive. . . . We would be derelict in our duties if we simply paid lip service to this rule, while shaping our holding to conform to our own interpretation of the evidence.")

Accordingly, for these reasons, Obryan's motion is denied.

### VI. Conclusion

For the reasons stated above, it is hereby **ORDERED** that the decision denying disability benefits is **AFFIRMED** and Obryan's motion (Dkt. No. 11) is **DENIED.**

DATED: March 29, 2012
       Albany, New York

_____
David R. Homer
U.S. Magistrate Judge